522 So.2d 117 (1987)
Patricia J. MOON, et al.
v.
CITY OF BATON ROUGE and Parish of East Baton Rouge, et al.
Glen Charles WARD
v.
CITY OF BATON ROUGE and Parish of East Baton Rouge, et al.
Nos. 86 CA 0913, 86 CA 0914.
Court of Appeal of Louisiana, First Circuit.
October 22, 1987.
Rehearing Granted in Part and Denied in Part January 6, 1988.
On Rehearing January 15, 1988.
On Second Rehearing March 16, 1988.
Writs Denied April 29, 1988.
*119 George Clauer, III, Baton Rouge, for plaintiff-appellant Patricia J. Moon, et al.
Michael Palmintier, Baton Rouge, for plaintiff-appellee, Glen Charles Ward.
James J. Zito, Baton Rouge, for defendant-appellant City of Baton Rouge, etc.
John Keogh, Baton Rouge, for defendant-appellant Admiral Ins. Co.
Arthur Cooper, Baton Rouge, for defendant-appellant Pacific Employers Ins. Co.
Before WATKINS, CARTER and CHIASSON[*], JJ.
WATKINS, Judge.
These are consolidated wrongful death and personal injury suits which arise out of an automobile accident that occurred on January 11, 1980. Patricia J. Moon filed suit individually and on behalf of her minor children, Jeffrey Scott Moon and Victoria Elizabeth Moon, against the City-Parish of East Baton Rouge, Louisiana (City-Parish), and its insurers, Admiral Insurance Company (Admiral) and Pacific Employers Insurance Company (Pacific), for the wrongful death of her husband, Kenneth R. Moon, the father of the two minor children, and as a survival action.
Glen Charles Ward filed suit against the City-Parish of East Baton Rouge, Louisiana, and its insurers, Admiral and Pacific, and against Aetna Casualty and Surety Company (Aetna), the insurer of the vehicle driven by Vincent Maggio, to recover for personal injuries. The court dismissed Aetna on summary judgment because it had exhausted its policy limits with payment to Mrs. Moon and her children and the payment of $5,561.00 to Mr. Ward.
The trial court entered judgment in favor of the plaintiffs holding the City-Parish, Admiral and Pacific liable in solido with Mr. Vincent Maggio. The basis of the City-Parish's liability was held to be the failure of the City-Parish to maintain a safe highway shoulder at the site of the collision, which was found by the trial court to be a substantial cause of Kenneth Moon's death and Glen Ward's injuries. Mr. Maggio's liability was based on the negligent operation of his motor vehicle. The court assessed interest and costs to each defendant according to each defendant's proportionate share of the total judgment. We amend the trial court's judgment, and affirm as amended.

*120 FACTS
The accident occurred January 11, 1980, at approximately 7:30 p.m. on Jones Creek Road, a two-lane hard surface road located in the City of Baton Rouge in the Parish of East Baton Rouge. The facts presented at trial establish that Kenneth Moon was proceeding in a southerly direction on Jones Creek Road when Vincent L. Maggio, who was proceeding in a northerly direction, entered Mr. Moon's lane of traffic causing a head-on collision. Mr. Moon and Mr. Maggio were fatally injured in the accident, and Glen Charles Ward, a passenger in the Maggio vehicle, sustained severe injures.
Prior to the accident, Mr. Maggio picked up Glen Charles Ward and Jimmy E. Oxner and had planned to go to Secrets Lounge on Highland Road. They stopped at a 7-11 Store prior to proceeding down Jones Creek Road. Mr. Billy V. Smith, a friend of Mr. Maggio, testified that he saw Mr. Maggio at the 7-11 that night and that he was drinking a beer. Mr. Smith also testified that the Maggio vehicle squealed out of the 7-11 parking lot. While proceeding down Jones Creek Road Mr. Maggio passed a vehicle being driven by Mr. Dugas. Mr. Dugas testified that the Maggio vehicle came out of nowhere and passed him at a high rate of speed which he guessed to be approximately 65 to 70 miles per hour. The speed at which the Maggio vehicle was traveling prompted Mr. Dugas to remark to his family that "Those kids need to slow that car down. First thing you know they're going to get themselves in an accidentget killed." Approximately one-half mile later Mr. Dugas noticed a cloud of smoke and could see tail lights moving about rather rapidly.
Mr. Oxner and Mr. Ward testified that Mr. Maggio had bent over to pick something up off of the floor when the right wheels of the car left the roadway. The car traveled approximately 180 feet before re-entering the highway and colliding head-on with Mr. Moon's vehicle.
Mr. Dugas was the first person to reach the scene of the accident, where both Mr. Ward and Mr. Oxner were trying to exit the Maggio vehicle. Later, Mr. Dugas noticed that another vehicle had been involved and went to see about the passengers. It was then that he found Mr. Moon pinned in his car, gasping for air. Mr. Dugas estimated that Mr. Moon lived for 12 to 15 minutes after the accident, obviously in great pain.
Prior to trial Patricia Moon negotiated a settlement with Mr. Maggio's insurer for the sum of $92,417.84 and received $25,000 from her own uninsured insurance carrier. Evidence of both settlements was admitted at trial over plaintiff's objection.
After trial on the merits, the trial judge rendered judgment in favor of Mrs. Moon, individually and on behalf of her minor children in the sum of $1,070,949.50. Judgment was also rendered in favor of Glen Charles Ward in the sum of $36,499.32. The trial court held the defendants Vincent Maggio, the City-Parish, Admiral and Pacific liable in solido for the wrongful death of Kenneth Moon and the personal injuries of Glen Charles Ward. The trial court credited the defendants, City-Parish, Admiral and Pacific with the amounts paid to Mrs. Moon by Aetna and its insureds, Vincent Maggio, Sr., and Vincent L. Maggio, II, in the sum of $92,417.84. The court disallowed any credit for the settlement paid to Mrs. Moon by State Farm under the uninsured motorist provision of a policy covering the Moon vehicle. All defendants were assessed with a pro-rata share of interest and costs.
On motion of the defendants the trial court modified its original judgment reducing the award made to Patricia Moon individually and on behalf of her minor children by one-half, representing the virile share (one-half) of Mr. Maggio with whom the plaintiff settled.
The following issues are presented for review.
1. Whether the trial court erred in finding the road shoulder unreasonably dangerous and a legal cause of the accident.
2. Whether Mr. Maggio's negligence constituted third-party fault so as to bar the plaintiff's claim against the city.
*121 3. Whether the trial court erred as a matter of law in awarding damages for loss of consortium to plaintiff, and alternatively whether the quantum awarded was excessive.
4. Whether the trial court erred in not casting Pacific for all costs and legal interest prior to and following judgment.
5. Whether the award of lost wages was excessive.
6. Whether the trial court erred in admitting evidence of the Maggio and underinsured insurance settlements.
7. Whether the court erred in not admitting evidence of Maggio's insolvency.
8. Whether the court erred in reducing the plaintiff's judgment by one-half.

STRICT LIABILITY OF CITY-PARISH
We will first address the question of strict liability of the City-Parish for the allegedly defective condition of the roadway. The trial court determined that the City-Parish was strictly liable for the defective shoulder at the point where the Maggio vehicle re-entered Jones Creek Road. The following reasons were enunciated by the trial court in this respect.
Mr. Oxner estimated the asphalt road had approximately a six-inch drop-off to the shoulder at the re-entry point.
Officer William E. Hornsby of the Baton Rouge City Police, who investigated the accident, testified that the Maggio car left 180 feet of tire marks along the right shoulder of Jones Creek Road before re-entering the road. That after re-entering Jones Creek Road the Maggio car proceeded approximately 96 feet in a northwesterly direction until it collided head-on with the Moon vehicle.... He also estimated that the Moon vehicle left four feet of skid marks before impact. Officer Hornsby further testified that the Maggio vehicle re-entered Jones Creek Road at a point immediately north of a private drive that entered Jones Creek Road. Officer Hornsby described Maggio's tire marks at re-entry as sliding marks.
Duane T. Evans, an expert in traffic engineering and traffic accident analysis, testified that he visited the scene of the accident on February 14, 1980, and that at the point the Maggio vehicle left Jones Creek Road the shoulder measured two to three feet in width and there was a two to three inch drop-off from the asphalt road to the shoulder. At the point of re-entry, Mr. Evans testified that the shoulder was two to three feet in width and at the point of re-entry there was a six-inch drop-off from the asphalt road to the shoulder. He stated that immediately south of the re-entry point, there was a minimum of a two-inch drop-off. Mr. Evans stated he used Officer Hornsby's measurements from Exhibit P-4 in determining the points where the vehicle left and re-entered Jones Creek Road. Mr. Evans testified that at the point of re-entry there was a hole that was six inches deep and measuring two to three feet across.
Mr. Evans concluded that the photographs of Maggio's re-entry reflected "yaw" marks which indicated the tires were partially rolling and partially sliding, an indication of loss of control....
Mr. Russell Miller testified that at the time of the accident he lived in the house which was located at the end of the private road south of the Maggio re-entry point. According to Miller the hole north of his driveway was about four inches deep and measured about one to one and a half feet in width. He attributed the hole to the mail carrier driving along the shoulder to service the mailbox.
Bert Guerin, a street superintendent of the City-Parish in 1980, testified that the City-Parish usually did not fix road-shoulder drop-offs until there was at least a three to four inch difference. Donald Ray O'Neil, an area supervisor for the City-Parish whose area included Jones Creek Road, testified that a drop-off had to be over two inches before it was crubbed up.
Robert S. Atkinson, chief construction engineer for the City-Parish in January 1980, testified that Jones Creek Road was overlaid with one inch of asphalt in
*122 November 1978, however, no shoulder work was included in the overlay.
Duane T. Evans and Walter H. Neal, Jr., an expert in traffic engineering, testified the road design of Jones Creek Road was substandard due to its width and the width of its shoulders. These gentlemen stated the minimum requirements would suggest a road 24 feet in width, instead of 20 feet; that there should be a minimum of six foot shoulders instead of two to three foot shoulders and the slope to the ditch was inadequate. They both testified that the substandard design contributed to the cause of the accident. This court is not convinced that the foregoing opinion is correct, however, it feels that the excessive drop-off was a cause in fact of the accident.
....
This Court finds that the asphalt road dropped off two to three inches when the Maggio vehicle entered the shoulder and there was a drop-off of approximately six inches at the point of re-entry.
Louisiana Civil Code article 2317[1] provides the basis of a finding of strict liability against the City-Parish under Louisiana law. The concept of strict liability has been specifically applied to municipalities for damages caused by things in their custody. Jones v. City of Baton Rouge-Parish of East Baton Rouge, 388 So.2d 737 (La.1980). The injured party seeking damages under art. 2317 need only prove that the thing which caused the damage was in the care or custody of the defendant, that the thing had a vice or defect that is, that it occasioned an unreasonable risk of injury to another and that his injury was caused by the defect. Jones, supra; Loescher v. Parr, 324 So.2d 441 (La.1975); McSweeney v. Department of Transportation and Development of Louisiana, 442 So.2d 659 (La.App. 1st Cir.1983). Once these elements are proven, the custodian can escape liability only by showing that the harm was caused by the fault of the victim, by the fault of a third person, or by an irresistible force. Shipp v. City of Alexandria, 395 So.2d 727 (La.1981).
The record establishes that Jones Creek Road has long been a part of the roadway system of the City-Parish of East Baton Rouge and as such was within the City-Parish's care and custody at the time of the accident.
The next question is whether the road had a vice or defect. It is the City's duty to travelers to keep the roadways and their shoulders in a reasonably safe condition. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980), Rue v. State Department of Highways, 372 So.2d 1197 (La.1979). As the Sinitiere court noted ... "an implicit necessity for the functional use of a shoulder is a connection between the roadway and shoulder that allows for safe gradual movement from one to the other." Sinitiere, supra at 825. The duty to maintain reasonably safe roads and shoulders extends to the protection of those people who inadvertently stray on to the road shoulders. This duty also extends to passengers in vehicles that stray from the road and passengers and drivers in vehicles who are likely to be injured when a driver of another vehicle goes out of control because of a defective shoulder. LeBlanc v. State, 419 So.2d 853 (La.1982), Sinitiere, supra at 825. In order to find a breach of this duty the court must find that the roadway and shoulders[2] at the scene of the accident were in an unreasonably dangerous condition. This determination will depend upon the particular facts and circumstances of each case.
*123 The trial court found a two to six inch drop to have existed from the road to the shoulder. Although it is true that the City-Parish is not required to reconstruct all of its roadways to meet modern standards, it is still required to maintain an existing roadway in a reasonably safe condition. Myers v. State Farm Mutual Automobile Insurance Company, 493 So. 2d 1170 (La.1986). This includes the leveling of shoulders when they become too low as a result of an overlay of the roadway. Therefore the trial court's finding of a defect in the shoulder was not clearly erroneous.
Next, the court must determine whether the defective shoulder caused the plaintiffs' injuries, that is, whether the two to six inch drop from the road caused Mr. Maggio's vehicle to react as it did when he attempted to re-enter the roadway. The appellants assert that the defect was not the sole proximate cause of the injuries sustained; rather the negligence of Mr. Maggio[3] was the cause in fact of the accident. The testimony clearly shows that Mr. Maggio was in control of his vehicle while he traveled in a straight line some 180 feet along the shoulder. He lost control of his vehicle when he attempted to re-enter the roadway. Mr. Oxner testified that upon re-entry the vehicle bounced and the next thing he knew they collided with Mr. Moon's vehicle. There was expert testimony supporting the trial court's finding that the defect in the road shoulder was a cause-in-fact of the accident and that Mr. Maggio's negligence, at most, indicates an instance of concurrent causes. In view of this evidence we cannot say that the trial court was clearly wrong.
Appellants alternatively contend that Mr. Maggio's negligence constitutes third party fault exonerating it of any liability. The standard of fault required by a third party in order to relieve an owner-custodian of liability under 2317 was articulated by this court in Lang v. Prince, 447 So.2d 1112 (La.App. 1st Cir.1984), writs denied at 450 So.2d 1309 and 450 So.2d 1311 (La.1984), as follows:
"When the actionable negligence of two tort feasors contributes in causing harm to a third party, each of them is responsible for the damage. They are solidarily liable." Dixie Drive It Yourself System New Orleans Company v. American Beverage Company, 242 La. 471, 137 So.2d 298, 301 (1962)....Third party fault under La.C.C. art. 2317 which contributes to the accident along with fault of the owner-custodian, results in the same solidary liability where that third party fault is not considered to be the sole cause of the accident. Olsen v. Shell Oil Company, 365 So.2d 1285 (La. 1978); Hessifer v. Southern Equipment, Inc., 416 So.2d 368 (La.App. 1st Cir.1982) [writs denied at 420 So.2d 982 (La. 1984)]; Godwin v. Government Employers *124 Insurance Company, 394 So.2d 751 (La.App. 3d Cir.1981).
Lang, supra at 1117.
Therefore, the inquiry is whether Mr. Maggio's negligence was the sole cause of the head-on collision. As discussed above, Mr. Maggio's negligence was at most, concurrent and therefore not sufficient to relieve the City-Parish of liability.

DAMAGES
Appellant, Admiral Insurance Company, contends that the trial court erred in awarding Patricia Moon consortium damages, as the accident occurred in 1980 prior to the amendment of 2315[4] allowing consortium damages. The trial court's reasons for judgment addressed this issue at three different points in its decision. Initially the court noted as follows:
In Louisiana, under LSA-C.C. art. 2315, the survivors are entitled to recover the damages which they sustained through the wrongful death of the deceased. Non-pecuniary loss, variously described in many cases as loss of love, affection, companionship, care, attention, nurture, guidance, society, consortium and like terms, is recoverable. Additionally, loss of support or earnings, a pecuniary loss, is recoverable.
After calculating the amount of lost wages the court again addressed the issue non-pecuniary damages as follows:
The court awards to Mrs. Moon for loss of love, affection, companionship and society the sum of $250,000.00. Also, an award of $150,000.00 is appropriate for each of the children.
The court again addressed the issue in its judgment stating as follows:
Further, judgment is rendered in favor of Patricia J. Moon for $250,000.00; in favor of Patricia J. Moon as tutrix of Jeffrey Scott Moon for $150,000.00 and in favor of Patricia J. Moon, as tutrix of Victoria Elizabeth Moon for $150,000.00, payment being for the loss of love, affection, companionship, society and consortium.
We find this issue to be a question of semantics. The trial court was clearly attempting to award a lump sum for non-pecuniary damages. In determining the proper elements of non-pecuniary damages in a wrongful death action the trial court followed the language in Marceleno v. State Dept. of Highways, 367 So.2d 882 (La.App. 2d Cir.1978), writ denied at 369 So.2d 1364 (La.1979). The Marceleno court concluded as follows:
In Louisiana, under LSA-C.C. Art. 2315, the survivors are entitled to recover "the damages which they sustained through the wrongful death of the deceased." Non-pecuniary loss, variously described in many cases as loss of love, affection, companionship, care, attention, nurture, guidance, society, consortium and like terms, is recoverable. Additionally, loss of support by a husband-father or a wife-mother, a pecuniary loss often times but not always categorized separately from nonpecuniary loss, is recoverable....
Id. at 889.
We find that the trial court's award to Patricia J. Moon for loss of love, affection, companionship, society and consortium did not award consortium damages as a separate element of damages. Rather the court was merely describing the damages included under the heading of non-pecuniary damages. We find no error in the trial court's award of non-pecuniary damages.
Alternatively the appellants contend that the award to Patricia J. Moon for loss of consortium and for lost wages were excessive. The court will first address the claim of excessive damages for non-pecuniary damages including loss of consortium.
The trial court calculated that Patricia A. Moon suffered damages of $250,000.00 *125 as a result of the loss of love, affection, companionship, society and consortium of her husband. The court awarded each minor child the sum of $150,000.00 for like damages.
This court has recently outlined the standard of review for excessive awards by the trial court in Lang.
Before a trial court damage award may be questioned as excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the present case. Reck v. Stevens, 373 So.2d 498 (La.1979). It is only after an articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered excessive. Carollo v. Wilson, 353 So.2d 249 (La.1977). Prior awards may serve as an aid in determining excessiveness only where the present award is shown to be greatly disproportionate to past awards for truly similar injuries. Reck, 373 So.2d at 501.
Lang, supra, at 1118.
The Fourth Circuit awarded a widow $235,000.00 for loss of love and affection in Bickham v. Airlie Corp., 468 So.2d 658 (La.App. 4th Cir.1985), writ denied, 470 So.2d 120 (La.1985). Also, in Caldarera v. Eastern Airlines, Inc., 705 F.2d 778 (5th Cir.1983) the court, applying Louisiana law, considered the sum of $250,000.00 to be the maximum award that could be allowed for the emotional losses arising from the death of the plaintiff's wife. Furthermore, the court held that the sum of $300,000.00 was the maximum award allowed a 4-year old child for the loss of his mother. The Caldarera court noted the following jury awards for similar injuries.
E.G., Cheatham v. City of New Orleans, 378 So.2d 369, 377 (La.1979) (jury award of $200,000 for 22-year-old widow's loss of love and affection of 27-year-old husband was reinstated after trial judge reduced award to $50,000); Sibley v. Menard, 398 So.2d 590 (La.App. 1980), writ denied, 400 So.2d 211 (La. 1981), aff'd on reh'g, 404 So.2d 980 (La. App.1981) (widow awarded $100,000 for loss of husband's love and affection); Domangue v. Eastern Air Lines, Inc., 542 F.Supp. 643 (E.D.La.1982) (widow received $100,000 for loss of husband's love, affection, and companionship after 10-year marriage)....
Caldarera, supra at 785.
Based on the trial record we are convinced that the Moon family shared a very close relationship and that each of the survivors suffered a tremendous loss when Kenneth Moon died. Similarly, the trial court stated in its findings of fact that it was very impressed with the closeness the Moon family shared in their daily lives. We do find that this award is quite close to the upper limits, but based on this record we do not find it to be excessive.

LOSS OF WAGES
The amount of lost past earnings and lost future earnings as set by the trial judge was in accord with testimony presented by Dr. Randy Rice, an expert economist. That amount did not constitute an abuse of the "much discretion" accorded the trier of fact in determining lost past and future earnings. Coco v. Winston Industries, Inc., 341 So.2d 332, 334 (La.1976).

SOLIDARITY
The trial court permitted the original answers previously filed by defendants Pacific and Admiral to be amended at the beginning of the trial to seek a "credit" for the settlement entered into by the Moons with Maggio's liability insurer. Plaintiffs contend that this amendment was improper. However, the trial court is permitted great discretion in the amendment of pleadings. See Comments under LSA-C.C.P. art. 1151. We hold its discretion was properly exercised in this case in permitting an amendment of the pleadings to reflect the settlement with Maggio's liability insurer.
Plaintiffs contend that Maggio was insolvent, and because Maggio was insolvent, the provisions of former Civil Code art. 2104 are applicable, under which plaintiffs could be awarded judgment for the full amount of the debt in tort, less the actual amount of the settlement. However, we *126 find in the transcript of the original trial no attempt by any party to introduce evidence of Maggio's insolvency. The sole attempt was made at a hearing on a new trial, at which plaintiffs proffered a stipulation of all parties as to Maggio's insolvency after the stipulation was ruled inadmissible. As we find nothing that would indicate that the exercise of due diligence could not have uncovered the evidence of insolvency at the original trial, we hold the trial court properly excluded evidence of Maggio's insolvency, and received that evidence only upon proffer. LSA-C.C.P. art. 1972(2).
Thus the situation is presented in which plaintiffs settled with Maggio's insurer, Maggio being a joint tort feasor, and reserved the right to proceed against the City-Parish and its insurer. The City-Parish operates as a single unit of government under a home rule charter. LSA-Louisiana Const. Art. 6, sec. 5. There were, thus, only two tortfeasors, Maggio and the City-Parish. As by their settlement with Maggio's insurer and Maggio, plaintiffs deprived the City-Parish of its right of contribution as against Maggio as a codebtor in solido, plaintiffs may receive only one-half of the amount of judgment from the City-Parish. That was the reasoning of the Third Circuit in Harvey v. Travelers Insurance Co., 163 So.2d 915 (La.App. 3d Cir. 1964), which reasoning is sound, and which we elect to follow. Harvey was necessitated by a 1960 amendment of LSA-C.C. art. 2103, which permitted a third party action to be brought against a joint tort feasor (a codebtor in solido in tort).
We, therefore, hold that plaintiffs are limited in their recovery to one-half of the amount of their judgment.

INTEREST
The trial court awarded the plaintiff, Patricia Moon and her minor children the total sum of $581,683.67. The defendants (City-Parish, Admiral and Pacific) were held jointly and solidarily liable for the total award. However, as between the defendants the trial court allocated the payment of the award as follows:

 City-Parish $200,000
 Admiral $300,000
 Pacific (any part of the judgment
 exceeding $500,000)

Furthermore, the trial court allocated the payment of interest, on the judgment, to each defendant, in proportion to its share of the total judgment as indicated above. Thus, each defendant was liable for the payment of all interest (both pre-judgment interest, and post-judgment interest) which accrued on their share of the judgment from the date of judicial demand (March 31, 1980) until fully paid.
Both City-Parish and Admiral have appealed that part of the trial court's judgment assessing them with a pro-rata share of the post-judgment interest. The main dispute between the parties arises from the fact that Pacific's policy contains a supplementary payments clause which provides for the payment of "all interest on the entire judgment which accrues after the entry of judgment." Only Admiral has appealed the trial court's pro-rata allocation of pre-judgment interest. We will first address the trial court's assessment of pre-judgment interest.

Pre-Judgment Interest
Admiral, the primary insurer, contends that its policy strictly limits its liability to $300,000. In addition, Admiral claims that because the insured was covered by an excess policy that the excess insurer, Pacific, should pay the pre-judgment interest which exceeds Admiral's policy limits.
Admiral's policy, under its definition for ultimate net loss, provides for the payment of court costs and interest on any judgment. However the policy also stipulates that:
With respect to bodily injury or property damage or personal injury or any combination thereof, Admiral's liability shall be only for the ultimate net loss in excess of the insured's retained limit ... and then for an amount not exceeding *127 the amount specified in ... the limits of liability section....
Pacific's policy makes no specific provision for the payment of pre-judgment interest.
LSA-R.S. 13:4203 provides for the payment of legal interest from date of judicial demand on all judgments, sounding in damages, "ex delicto." Pursuant to this statute, the courts of this state have, on numerous occasions, held insurers liable for interest and costs which exceed the policy limits. Simon v. Ford Motor Company, 282 So.2d 126 (La.1973); Glazer v. Louisiana Trailer Sales, Inc., 313 So.2d 266 (La.App. 4th Cir.1975); Inabinet v. State Farm Automobile Insurance Co., 262 So.2d 920 (La.App. 1st Cir.1972); Doty v. Central Mutual Insurance Company, 186 So.2d 328 (La.App. 3d Cir.1966), certiorari denied, 249 La. 486, 187 So.2d 451 (1966) ("no error of law"). The jurisprudence has interpreted LSA-R.S. 13:4203 to require the insurer, in the event of judgment, to pay, in addition to policy limits, judicial interest on such policy limits from the date of judicial demand. This applies to primary as well as excess insurers, making each liable for the interest attributable to their proportionate share of the total judgment. The fact that an excess policy is in effect does not alter the legal duty of a primary insurer to pay its pro-rata share of interest. Travelers Indemnity v. Reserve Insurance Company, 364 So.2d 1041 (La.App. 1st Cir.1978); Travelers Indemnity v. Certain Underwriters at Lloyd's, 566 F.Supp. 267 (E.D.La.1983), citing Richardson v. Tate, 269 So.2d 278, (La.App. 4th Cir.1972), writs denied at 271 So.2d 260, 261 (La.1973); Blanchard v. Rodrigue, 340 So.2d 1001 (La.App. 1st Cir.1976), writs refused, 341 So.2d 1129 and 341 So.2d 1130 (La.1977) ("no error of law"). Therefore, we find that the trial court correctly allocated the payment of pre-judgment interest according to each defendant's proportionate share of the total judgment.

Post-Judgment Interest
Admiral and the City-Parish contend that the trial court erred in not assessing Pacific with all the interest on the entire judgment from the date of judgment, pursuant to the Pacific policy. The Pacific policy contains a "Supplementary Payments" clause which expressly agrees to pay in addition to the amount of ultimate net loss payable:
All expenses incurred by PEIC, all costs taxed against the insured in any suit defended by PEIC and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before PEIC has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of PEIC's liability thereon; ....
The jurisprudence has interpreted identical supplementary payment clauses on numerous occasions. The courts have consistently held that the insurer intended to provide its insured with supplementary protection for all interest and costs on the entire judgment which accrues after entry of judgment. Simon, supra; Blanchard, supra; Glazer, supra; Inabinet, supra; Doty, supra.
It is axiomatic that an insurance policy is a contract which expresses the law between the contracting parties. As such it must be enforced, according to its terms where there is no ambiguity. Freyoux v. Estate of Bousegard, 484 So.2d 761 (La. App. 1st Cir.1986), writ denied, 486 So.2d 753 (La.1986). The provision in the Pacific policy providing for the payment of the entire post-judgment interest is unambiguous and must therefore be enforced as written. The fact that Pacific's policy clearly refers to the underlying primary policy of Admiral and its respective policy limits leads us to the inescapable conclusion that although Pacific was aware of the primary policy it chose not to alter the language of its policy, providing for payment of interest on the entire judgment accruing after entry of judgment. Therefore, we find that Pacific is liable for interest on the entire amount of the judgment which accrued after the entry of judgment and before Pacific pays or tenders or deposits in court that part of the judgment which does not exceed the limit of Pacific's liability thereon.
*128 Therefore, for the above and foregoing reasons, the judgment of the trial court is amended, and affirmed as amended so as to require appellant, Pacific Employers Insurance Company, to pay the interest on the entire amount of the judgment which accrued after the entry of judgment and before Pacific pays, tenders or deposits in the court that part of the judgment which does not exceed the limit of Pacific's liability thereon. Costs on this appeal are to be paid by Pacific.
AMENDED, AND AFFIRMED AS AMENDED.

ON REHEARING
Before WATKINS, CARTER and CHIASSON[*], JJ.
PER CURIAM.
We granted a rehearing because we determined that we had incorrectly cited LSA-C.C.P. art. 1972 as being a rule of evidence, when that article clearly has authority only as to the question of whether or not a new trial should be granted.
It was stipulated by counsel that Vincent L. Maggio was insolvent although counsel for defendants reserved the right to challenge the admissibility of the stipulation. Although the record is lacking a transcript of the proceedings on a partial new trial, it appears from the amended judgment in the matter, and from the minutes of court, that a partial new trial took place on March 11, 1986, at which time the fact of Maggio's insolvency was held inadmissible as irrelevant. The stipulation stating that Maggio was insolvent was then proffered.
We hold that the evidence of Maggio's insolvency was not irrelevant, for the reasons given below, and that it should have been admitted into evidence.
At the time of the accident, January 11, 1980, LSA-C.C. arts 2104 and 2105 provided for the effect of the insolvency of a codebtor in solido. These articles were superseded by LSA-C.C. art. 1806. The comments under LSA-C.C. art. 1806 indicate that the article makes no change in the law. Comment (b) under LSA-C.C. art. 1806 states that there is virtually no jurisprudence on the effect of the insolvency of a solidary obligor.
The present art. 1806 took effect January 1, 1985, after the accident had occurred. It touches upon a substantive matter, and cannot be accorded retroactive effect. Thus, we quote and apply former LSA-C.C. arts. 2104 and 2105.
Art. 2104 If one of the codebtors in solido pays the whole debt, he can claim from the others no more than the part and portion of each.
If one of them be insolvent, the loss occasioned by his insolvency must be equally shared amongst all the other solvent codebtors and him who has made the payment.
Art. 2105 In case the creditor has renounced his action in solido against one of the debtors, and one or more of the other codebtors become insolvent, the portion of the insolvent shall be made up, by equal contribution, by all the debtors, and even those precedently discharged from the debt by the creditor in solido, shall contribute their part.
These articles make it clear that if one of the co-debtors in solido is insolvent, the loss must be borne by the remaining co-debtors in solido.
In the present case, there were only two debtors in solido, Maggio and the City-Parish of East Baton Rouge. As Maggio must be considered insolvent by effect of stipulation of counsel, the City-Parish of East Baton Rouge becomes liable for the whole of the debt less a credit for the sum received by Mrs. Moon from Aetna Casualty and Surety Company when Mrs. Moon settled with Aetna, or the sum of $92,417.85.
Accordingly, our original judgment is amended to award Mrs. Patricia J. Moon individually and as tutrix of Jeffrey Scott Moon and Victoria Elizabeth Moon the whole of the debt less the sum received by Mrs. Moon from Aetna. In all other respects our original judgment in this matter is reaffirmed.
*129 JUDGMENT AMENDED AND RENDERED.

ON SECOND REHEARING
Before WATKINS, CARTER and CHIASSON[*], JJ.
PER CURIAM.
We granted a second rehearing to review the correctness of our holding on rehearing that under the provisions of former LSA-C.C. arts. 2104 and 2105 the loss to the plaintiff-creditor because of the insolvency of the codebtor in solido Maggio must be borne by the remaining codebtor in solido, the City-Parish of East Baton Rouge.
The City-Parish contends the provisions of LSA-C.C. arts. 2104 and 2105 apply only to a loss suffered by a codebtor or codebtors in solido as a result of the insolvency of one of the codebtors. There is no need to afford the creditor the protection of these two articles since the creditor can protect himself from the insolvency of a codebtor in solido by collecting the whole debt if necessary from the remaining solidary debtors. As among themselves, the debtors in solido are only liable for their virile share. If one is required to pay the whole debt, he can enforce contribution from his codebtors. Under art. 2104, if one of the codebtors is insolvent, the loss resulting from his insolvency "must be equally shared amongst all the other solvent codebtors and him who has made the payment."
Plaintiff takes the position that the rationale of the decisions in Wall v. American Employers Insurance Co., 386 So.2d 79 (La.1980), and Harvey v. Travelers Insurance Company, 163 So.2d 915 (La.App. 3rd Cir.1964) which hold that the unreleased codebtor is entitled to a reduction for the pro-rata portion of the released co-debtor, is that the creditor has deprived the unreleased codebtor of his right to contribution from the released codebtor. This rationale, plaintiff argues, is not applicable to a release by the creditor of an insolvent co-debtor in solido, because in practical effect the remaining codebtor in solido cannot successfully enforce the right of contribution against a codebtor who is insolvent, and hence the right of the solvent codebtors in solido has not been prejudiced. However, in view of the plain language of LSA-C.C. art. 2104, "the loss occasioned" by the insolvency of a codebtor must be construed as the loss to the insolvent's codebtors in solido, because this provision of the second paragraph of the article is premised on a factual situation where one of the solidary codebtors pays the whole debt. As we stated above, there was no need for the lawmaker to afford the creditor the provisions of art. 2104 or art. 2105, because the creditor can collect the whole debt from the solvent codebtor. If the creditor elects to settle with the insolvent, as is here the case, he does so knowing that the remaining codebtors are entitled to a reduction for the released codebtor's virile share.
LSA-C.C. art. 2104 declares that it applies to a situation where one of the codebtors in solido pays the whole debt, and since the whole debt is paid it clearly cannot be construed to apply to a situation where the creditor has sustained a loss due to the insolvency of a debtor in solido whom he has released.
LSA-C.C. art. 2105 applies to a situation where the creditor has renounced his action in solido against one of the debtors, and one or more of the other codebtors become insolvent, even the discharged debtor shall contribute his part of the insolvent's portion. This article simply extends the application of the rule in art. 2104 to a codebtor "precedently discharged from the debt by the creditor...." The codebtor discharged by the creditor as set forth in this article presumably could not be the insolvent, because to give the remaining codebtors relief from him would be a futile act.
As the insolvency of Maggio's estate as a codebtor in solido is not the situation considered in former LSA-C.C. arts. 2104 and 2105, the share of the debt that must be *130 borne by the City-Parish of Baton Rouge is one-half of the debt.
We therefore vacate our opinion on rehearing and reinstate our original opinion, for the reasons set forth herein. All costs on rehearing to be borne by plaintiffs.
ORIGINAL OPINION REINSTATED.
CARTER, J., concurs.
NOTES
[*] Judge Remy Chiasson, retired, has been assigned temporarily to this Court by the Supreme Court of Louisiana, to fill the vacancy created by the death of Judge John S. Covington.
[1] LSA-C.C. art. 2317 provides:

We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications.
[2] In La.R.S. 48:1(20)-(21), the legislature has defined "roadway" and "shoulder." "Roadway" means that portion of a highway improved, designed or ordinarily used for vehicular traffic exclusive of the berm or shoulder. "Shoulder" means the portion of the highway contiguous with the roadway for accommodation for stopped vehicles, for emergency use and for lateral support of base and surface.
[3] The court found that Mr. Maggio was negligent in the operation of his vehicle which contributed to the accident. The trial court articulated the following reasons for its decision.

Ms. Oxner testified that the Maggio vehicle was traveling about 50-55 m.p.h. when Mr. Maggio reached down to pick up something, perhaps a cigarette, at which time the right wheels dropped off from the asphalt road to the shoulder. According to Mr. Oxner, Mr. Maggio drove Jones Creek Road about every day. That the road drop-off and shoulder condition was common knowledge among the occupants of the vehicle.
There was no testimony that the Maggio vehicle reduced its speed while traveling the shoulder or any obstructions to prohibit it from continuing along the shoulder until the vehicle's speed could be reduced to a reasonable speed before re-entry. In LeBlanc v. State, 419 So.2d 853 (La. 1982), the Supreme Court stated that courts should not look for extract rules of precedent from its opinions on which to rely but should decide each case on its merits. That courts should apply a duty-risk analysis to cases in order to properly decide them. The Supreme Court in LeBlanc concluded that a plaintiff is not guilty of contributory negligence when the re-entry to a highway from a defective road shoulder is an instinctive reaction.
Mr. Maggio's re-entry on to Jones Creek Road is obviously not an instinctive reaction inasmuch as he traveled along the shoulder some 180 feet. Considering Mr. Maggio was aware of the road and shoulder condition, no apparent reduction of speed and no obstacles to prevent him from reducing his speed to a safe re-entry speed, this Court finds he was at fault, which fault was a cause of the accident....
[4] LSA-C.C. art. 2315 reads as follows:

Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
Damages may include loss of consortium, service, and society, and shall be recoverable by the same respective categories of persons who would have had a cause of action for wrongful death of an injured person.
Amended by Acts 1982, No. 202, § 1; Acts 1984, No. 397, § 1; Acts 1986, No. 211, § 1.
[*] Judge Remy Chiasson, retired, has been assigned temporarily to this Court by the Supreme Court of Louisiana, to fill the vacancy created by the death of Judge John S. Covington.
[*] Judge Remy Chiasson, retired, has been assigned temporarily to this Court by the Supreme Court of Louisiana, to fill the vacancy created by the death of Judge John S. Covington.